WILLIAM L. NEVIN, SURVIVING EXECUTOR OF THE ESTATE OF JOHN WANAMAKER, DECEASED, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 31551. Promulgated April 15, 1929.

*Maurice Bower Saul, Esq., Owen J. Roberts, Esq., J. Marvin Haynes, Esq., Joseph A. Lamorelle, Esq.,* and *Ulric J. Mengert, Esq.,* for the petitioner.

*Maxwell E. McDowell, Esq., Frank T. Horner, Esq., Eugene G. Smith, Esq.,* and *Ralph F. Staubly, Esq.,* for the respondent.

16

18

24

28

OPINION.

GREEN: The question presented in this proceeding is whether the respondent erred in including as a part of the decedent's gross estate under the provisions of section 402(c) of the Revenue Act of 1921, an amount of $41,764,241.04 representing the value as of the date of the decedent's death of various properties transferred by the decedent within two years prior to his death. The parties now agree that the value of such properties as of the date mentioned was only $36,766,376.17 and that the value of the property put in issue by the respondent's amendment to his answer, which the respondent now claims should also have been included in the gross estate, was $24,000. The provisions of section 402(c) are:

SEC. 402. That the value of the gross estate of the decedent shall be determined by including the value at the time of his death of all property, real or personal, tangible or intangible, wherever situated—

\* \* \* \* \* \* \*

(c) To the extent of any interest therein of which the decedent has at any time made a transfer, or with respect to which he has at any time created a trust, in contemplation of or intended to take effect in possession or enjoyment at or after his death (whether such transfer or trust is made or created before or after the passage of this Act), except in case of a bona fide sale for a fair consideration in money or money's worth. Any transfer of a material part of his property in the nature of a final disposition or distribution thereof, made by the decedent within two years prior to his death without such a consideration, shall, unless shown to the contrary, be deemed to have been made in contemplation of death within the meaning of this title.

The three contentions of the petitioner as to why none of the items totaling $36,790,376.17 should be included as a part of the decedent's gross estate have been mentioned in our preliminary statement. We will discuss the second contention first, namely, that the various transfers were not made in contemplation of or intended to take effect in possession or enjoyment at or after the decedent's death.

The meaning of the phrase " in contemplation of death " has been construed by the courts and by this Board in a large number of cases.

In *Rea* v. *Heiner*, 6 Fed. (2d) 389, the District Court for the Western District of Pennsylvania had before it the question whether certain transfers were made in contemplation of death within the meaning of section 402 (c) of the Revenue Act of 1918, which section is identical with section 402 (c) of the 1921 Act. In the course of the opinion, the court said:

Under the authorities the words " in contemplation of death " have a distinctive meaning. Lord Mansfield once said: " We all have in us the seeds

of mortality. But 'contemplation of death' is not the general knowledge of all men that they must die at some time."

The Court then quotes from four decisions, cites four others and continues as follows:

These principles have been applied with great uniformity in the adjudicated cases, both in the state and federal courts. There is a common agreement that the words "contemplation of death" mean not the general knowledge of all men that they must die; that it must be a present apprehension, from some existing bodily or mental condition or impending peril, creating a reasonable fear that death is near at hand; and that, so arising, it must be the direct and animating cause, and the only cause, of the transfer. If this apprehension, so arising, is absent, there is not that contemplation of death intended by the statute, especially when another adequate motive actuating the gift is shown.

In *Meyer* v. *United States*, 60 Ct. Cls. 474, we find the following language:

A review of the authorities is scarcely necessary to sustain the proposition that the contemplation of death referred to in the statute is not that contemplation of death which must be present with all of us, mindful of its certainty at some time, we know not when, but it is that state of mind which by reason of advanced age, serious illness, or other producing cause induces the conviction that death in the near future is to be anticipated. If it be said that there need not be a conviction that death is imminent, there must at least be a belief that it is to be expected in the very near future rather than in the usual course of events; and in this state of mind, in this belief in the near approach of death, must be found the motive for the conveyance if it is properly to be characterized as made in contemplation of death.

In *Flannery* v. *Willcuts*, 25 Fed. (2d) 951, the Circuit Court of Appeals for the Eighth Circuit, in reversing the District Court and holding that certain transfers made by Mary T. Hill (the widow of James J. Hill) were not made in contemplation of death, said:

We are also in accord with counsel's statement in his brief that the cases " hold that the thought of death must be the actuating motive without which the gift would not have been made "—adding thereto the qualification that the " thought of death " as an anticipation of the inevitable which we all realize is not within the statute; but to be within the statute the thought must arise because of some known infirmity which, it is believed, will likely cause death.

In *United States Trust Co. of New York, Executor*, 14 B. T. A. 312, we said:

\* \* \* The term " contemplation of death " is meant an apprehension of death within the reasonably near future from some existing bodily or mental condition, and not the general expectation of ultimate death entertained by everyone, and that such contemplation of death must be the motive which prompted the transfer and without which the transfer would not have been made, in order to include the transferred property in the estate of the decedent subject to tax.

To the same effect, see *Starck, Executor*, 3 B. T. A. 514; *Spofford, Administratrix*, 3 B. T. A. 1016; *Phillips, Executor*, 7 B. T. A.

1054; *Stein et al., Executors*, 9 B. T. A. 486; *Davis, Executrix*, 9 B. T. A. 1212; *Gimbel et al., Executors*, 11 B. T. A. 214; *Illinois Merchants Trust Co., Executor*, 12 B. T. A. 818; *McCormick et al., Executors*, 13 B. T. A. 423; *Crilly et al., Executors*, 15 B. T. A. 389; and *White et al., Executors*, 15 B. T. A. 470.

Examining the facts in this case in the light of the above construed meaning of the phrase " in contemplation of death," we find a man, over four score years of age, actively engaged not only in managing the affairs of two of the largest department stores of the United States, but taking a vigorous part in numerous other business and community affairs as well. We find him cheerful, optimistic, mentally alert and planning far into the future. True, due to an enlarged prostate, he had been carrying for over ten years an indwelling catheter, which had to be changed every five days, but after the first two months his body had built up such an immunity to this condition that there was no longer any danger from its use. It had no effect on his general condition of health and had nothing whatever to do with his death. Outside of the catheter, and a predisposition to colds in cold weather, he was in excellent physical condition. He contracted a cold in September, 1922, which developed into bronchial pneumonia from which he died on December 12, 1922. Over 70 witnesses testified and over 70 exhibits were offered on behalf of the petitioner, and the record is replete with facts and circumstances showing that death was the farthest from John Wanamaker's mind. He told several people that he expected to live to be a hundred. He was planning on taking a very active part in the celebration of the Sesqui-Centennial to be held in 1926, had promised to be the principal speaker at an anniversary in 1932, and had in mind visiting Japan at some time in the distant future. Such facts do not indicate " a present apprehension, from some existing bodily or mental condition or impending peril, creating a reasonable fear that death is near at hand."

A total of over 360 letters and telegrams written by John Wanamaker during the last three years of his life, and representing all of such writings that could be found, were put in evidence by the parties. The letters introduced by the respondent are in themselves almost sufficient to overcome the presumption contained in the statute. These letters, written by a father to a son who was the dearest to him of all people in the world, are spontaneous and confidential. They give us a clear conception of what the writer thought, of his outlook upon life and of his own ideas as to his physical condition. The first four letters appearing in our findings were introduced by the petitioner and the last four by the respondent. The most damaging letter (if such it may be called) from the petitioner's viewpoint,

of all the letters introduced, is the letter written on January 9 and 10, 1921, where he said " Slept like a Top feel stronger but still higgledly piggedly on my two feet—Inside I feel I am 55 yrs. old but walking with an old fellow shaky on his legs—but oh so much better am I than the man you led into the train at 16 Dec—," which part of the letter the respondent has constantly emphasized in his brief and oral argument. We, however, fail to see anything in this letter indicating that the writer was alarmed at his condition, but, on the contrary, we see a man at that moment very much interested in fishing, humorously referring to his age and his rapid recovery of his strength. Others parts of the same letter are " Rised me at 6 :45 on deck at 8—thermo 75—a very fine morning—less wind—sea smoother—dressed in my fishing clothes hoping for a good catch— * * * We are contentedly filling in our time waiting arrival of Wakita to fly like an Eagle swift ! instead of a Gadfly adrift ! Hear, Hear ! * * * Now for codfish breakfast & then to the fishing reefs."

The evidence also shows that for at least 8 years prior to the transfers in 1920, it had been the intention of John Wanamaker to give the business to Rodman. Without deciding the question of ownership of the stock of the two New York corporations, we find that John Wanamaker, from time to time, as additional capital was contributed, assigned additional stock in these corporations to Rodman until by January 11, 1918, there had been assigned to him all of the stock of the A. T. Stewart Realty Co. and 51 per cent of the stock of John Wanamaker, New York. Following the death of Thomas, in 1908, the dividends from the two stores, until 1920, were divided equally between father and son, regardless of stock ownership. There were no dividends declared by the A. T. Stewart Realty Co. When Wanamaker first spoke to Nevin about his intention to give the business to his son, the corporations were operating with a very large amount of borrowed capital. In order to improve the appearance of the balance sheet, Wanamaker felt it necessary, in 1917, to convey the Philadelphia store building and the real estate upon which it was situated, to the Philadelphia corporation. Again, in 1919, he found it advisable to convey to the corporation large amounts of Philadelphia real estate owned by him. The situation was not easy to handle and obviously was not such as to justify his turning over the business to Rodman and throwing upon him at that time the sole responsibility and liability. By 1920 the situation had greatly improved and while the enterprises were not then clear of their heavy borrowings, it could reasonably be anticipated that in the near future they would be in a satisfactory financial condition. At that time he told Nevin that " the business was now in condition or in such shape that he could carry out the intention he had had

for some years past, to give the business to his son." The transfers here in question, the details of which we have set out in our findings, were then made.

It should also be noticed that the effect of the transfers made in December, 1920, was to make inoperative several provisions of John Wanamaker's will, made on May 14, 1914. About four years after the will was made, a codicil was made, which took care of the changes that had been made in the interim, such as the transfer of the Philadelphia store to the Philadelphia corporation. In his will and the codicil thereto, John Wanamaker had very carefully directed the disposition to be made of his entire estate. The transfers made by him in the fall of 1920 left him with only a small portion of the property theretofore owned by him. Many of the provisions in the will for specific bequests have failed because at the time of his death he did not own the property bequeathed. An example of this is to be found in the provisions of the will by which 49 per cent of the stock of John Wanamaker Philadelphia was to be placed in trust. Other provisions of the will have been rendered in whole or in part inoperative by reason of the transfers. It seems probable to us that if the apprehension of death was the motivating cause of the transfers in 1920, John Wanamaker would at the same time or within a reasonable time thereafter, have made a new will, a will which took into consideration his greatly reduced holdings and one which directed the disposition of only such property as he then owned and which would care for those whom he was most anxious to care for.

There is nothing in the record in this case that indicates that John Wanamaker ever contemplated death, using that phrase in the sense in which it is used in the cases cited above. The gifts could not, therefore, have been made in contemplation of death. Furthermore, we find that the real motive for making the gifts was his long existing desire to see, during his lifetime, the son, whom he most dearly loved, and who had worked with him for over 40 years, in full ownership, possession and control of the business they had built up together.

The second part of the petitioner's second contention is that the properties of the value of $36,790,376.17 should not be included as a part of John Wanamaker's gross estate, because such transfers were *not* intended to take effect in possession or enjoyment at or after Wanamaker's death. With the exception of the transfer of the preferred stock, which we will later discuss, there can be no doubt whatever that the transfers were not and could not have been so intended. The fact is that on December 14, 1920, Rodman became the sole owner of all of the stock of John Wanamaker Philadelphia, which corporation owned all of the two New York corporations. The gift was

absolute, complete, irrevocable and unconditional on that day. The transfers took effect in possession and enjoyment at that time.

Did John Wanamaker intend the transfer of the preferred stock of John Wanamaker Philadelphia to the Fidelity Trust Co. in trust for his daughters, to take effect in possession or enjoyment at or after his death? We have already found that he did not make the transfer in contemplation of death. In creating the trust in which the Fidelity Trust Co. was named trustee, the settlor reserved unto himself no powers whatever. The transfer of the stock to the trustee was absolute and left the decedent without any interest or control therein. The respondent contends that the stock *res* itself carried to the beneficiaries no scintilla of further or additional beneficial interest in the business than the dividends which were not to begin to accrue until six months after John Wanamaker's death; that in effect the stock was no more than an ordinary promissory note of the corporation; and that the enjoyment of the trust being thus specifically limited to a receipt of income by way of guaranty dividends accruing six months after the settlor's death, powerfully indicates that the whole trust is of the nature described by the statute as being one intended to take effect in possession and enjoyment at or after the death of the settlor. This contention, however, overlooks the last paragraph of the stock certificate, which provides that " Upon dissolution, voluntary liquidation, or sale of all the property, and assets, of John Wanamaker Philadelphia the payment of the Preferred Capital Stock shall be deferred to the payment of the Common Capital Stock; after the Common Capital Stock has been paid, in full, at par, the Preferred Capital Stock shall be paid, in full, at par; * * *." In other words, if for any reason the corporation had been dissolved after the transfer of the preferred stock to the trustee, the latter would have received, after the common stock had been paid in full at par, $1,000,000 for the preferred stock and the beneficiaries would have received income from the investment of this amount immediately and without regard to whether the settlor were living or dead.

In *Reinecke* v. *Northern Trust Co.*, 278 U. S. 339, the Supreme Court of the United States had before it the question whether seven different trusts or any of them were intended to take effect in possession or enjoyment at or after the settlor's death, within the meaning of the identical section of the statue we are now considering. In two of the trusts, the settlor had reserved a power of revocation and for that reason the Supreme Court held they were within the statute. In the other five trusts, the settlor reserved to himself power to supervise the reinvestment of trust funds, to require the trustee to execute proxies to his nominee, to vote any shares of stock held by the trustee, to control all leases executed by the trustee, and to ap-

point successor trustees. A power was also reserved "to alter, change or modify the trust," which was to be exercised, in the case of four of the trusts, by the settlor and the single beneficiary of each trust, acting jointly, and in the case of the other one, by the settlor and a majority of the beneficiaries named, acting jointly. Notwithstanding the powers reserved to the settlor in the last five trusts, the Supreme Court, through Mr. Justice Stone, held that such trusts were not within the statute. The opinion reads in part as follows:

In its plan and scope the tax is one imposed on transfers at death or made in contemplation of death and is measured by the value at death of the interest which is transferred. (Citations). It is not a gift tax and the tax on gifts once imposed by the Revenue Act of 1924, C. 234, 43 Stat. 313, has been repealed, 44 Stat. 126. One may freely give his property to another by absolute gift without subjecting himself or his estate to a tax, but we are asked to say that this statute means that he may not make a gift *inter vivos*, equally absolute and complete, without subjecting it to a tax if the gift takes the form of a life estate in one with remainder over to another at or after the donor's death. It would require plain and compelling language to justify so incongruous a result and we think it is wanting in the present statute.

It is of significance, although not conclusive, that the only section imposing the tax, sec. 401, does so on the net estate of decedents and that the miscellaneous items of property required by sec. 402 to be brought into the gross estate for the purpose of computing the tax, unless the present remainders be an exception are either property transferred in contemplation of death or property passing out of the control, possession or enjoyment of the decedent at his death. They are property held by the decedent in joint tenancy or by the entirety, property of another subject to the decedent's power of appointment and insurance policies effected by the decedent on his own life, payable to his estate or to others at his death. The two sections read together indicate no purpose to tax completed gifts made by the donor in his lifetime not in contemplation of death, where he has retained no such control, possession or enjoyment. In the light of the general purpose of the statute and the language of sec. 401 explicitly imposing the tax on net estates of decedents we think it at least doubtful whether the trusts or interests in a trust intended to be reached by the phrase in sec. 402(c) "to take effect in possession or enjoyment at or after his death," include any others than those passing from the possession, enjoyment or control of the donor at his death and so taxable as transfers at death under sec. 401. That doubt must be resolved in favor of the taxpayer. *Gould* v. *Gould*, 245 U. S. 151, 153; *United States* v. *Merriam*, 263 U. S. 179, 187.

Wanamaker retained no right, title or interest in the preferred stock and we are clearly of the opinion that the gift was to take effect immediately and not at or after his death and since it was not made in contemplation of death, the value thereof should not be included in the gross estate.

Under a Pennsylvania statute (1919 P. L. 521, sec. 1 (c)), which in the essentials is practically identical with the Federal statute here under consideration, the Commonwealth of Pennsylvania endeavored to tax the transfers of the common and preferred stocks of John Wanamaker Philadelphia as being transfers made in contemplation

of or intended to take effect in possession or enjoyment at or after death. Appeals were taken to the Orphans' Court of Philadelphia County, and on September 13, 1926, Judge Gest rendered his decision in favor of the estate. See *Estate of John Wanamaker*, Orphans' Court of Philadelphia County, October Term, 1924, No. 3792. Exceptions were filed by the Commonwealth and a reargument had before the Orphans' Court of Philadelphia County sitting *en banc*. Five judges, including Judge Gest, considered the exceptions, and in an opinion by Judge Henderson, 8 District and County Reports 569 (1926), the court dismissed the exceptions and sustained Judge Gest's adjudication. The Commonwealth did not appeal to the Supreme Court of Pennsylvania within the three months allowed, and in so far as the Pennsylvania inheritance tax is concerned, the case is now concluded with decisions in favor of the estate from which no appeals can be filed. In *Phillips, Executor*, 7 B. T. A. 1054, involving a similar situation, we said, in part, p. 1060:

While such finding is not conclusive upon this Board, it is entitled to weight, especially in view of the similarity of the Illinois statute to the Federal statute on the same subject of taxing gifts, transfers, etc., made in contemplation of death.

In conclusion, we find and hold that none of the various transfers here in question were made by John Wanamaker in contemplation of or intended to take effect in possession or enjoyment at or after his death, within the meaning of section 402 (c) of the Revenue Act of 1921, and it, therefore, becomes unnecessary to discuss the petitioner's first and third contentions. The deficiency, if any, should be recomputed by eliminating from the gross estate as determined by the respondent, the several items totaling $41,764,241.04, previously itemized by us in our findings.

Reviewed by the Board.

*Judgment will be entered under Rule 50.*

---

STERNHAGEN, dissenting: I am of opinion that the Board has erroneously applied the law. The statute requires the petitioner to prove "to the contrary" of the presumption that the transfer was made in contemplation of death. *C. D. Lehman, Executor*, 6 B. T. A. 791. I do not think the Board has tested the evidence by the statutory method. If it had done so, I think it would be decided that the preponderance of the evidence did not overcome the statutory presumption.

LANSDON, MARQUETTE, TRAMMELL, ARUNDELL, and MURDOCK agree with this dissent.